584 So.2d 318 (1991)
STATE of Louisiana
v.
Lester MORAN.
No. 90-KA-0716.
Court of Appeals of Louisiana, Fourth Circuit.
July 1, 1991.
*320 Harry F. Connick, Dist. Atty., Charmagne Padua, Asst. Dist. Atty., New Orleans, for plaintiff.
Sherry Watters, Orleans Indigent Defender Program, and Martin E. Regan, Jr., Regan & Associates, New Orleans, for defendant.
Before BARRY, WILLIAMS and PLOTKIN, JJ.
PLOTKIN, Judge.
Defendant Lester Moran appeals his conviction for aggravated rape and attempted aggravated kidnapping, making the following assignments of error: (1) that the trial court erred in denying his motions for mistrial and for new trial based upon the improper admission of hearsay testimony by a police officer regarding the victim's statements about the crimes, and (2) that the prosecution presented insufficient evidence to convict him of those crimes.

FACTS:
On Sunday morning, June 5, 1988, the victim, a twenty-four year old female Uptown resident, was approached by a black male, driving a brown Cutlass, while she was taking a walk in Audubon Park. She gave the driver directions two different times and he drove away both times, then returned. On his third return, he got out of his car and tried to get her into the car, saying he was lost. She refused to accompany him.
The victim's memory of the subsequent events is sketchy. She remembers being in the black man's car, while he was holding her neck and leaning toward her and she screamed for help and pounded on the dash board. The next thing she remembers is lying on her back in the car and the perpetrator telling her to get out of the car. She remembers getting out of the car and thinking she had to get home and had to see a doctor. Her next memory is not until eleven days later when she awoke in Touro Hospital on June 16, 1988.
Several residents of the Uptown area testified to seeing a brown Cutlass on Henry Clay and Calhoun streets and to hearing a woman scream. One witness said she saw a woman's head bobbing up and down in the front seat as the driver attempted to hold her down; another testified to seeing a young woman with short blond hair, who was bleeding profusely, hanging out of the car screaming for help. That witness obtained a partial license plate number as the car passed. A third witness stated that he saw a young woman fall out of a brown Cutlass and onto Tchoupitoulas Street; the car kept going, heading toward downtown. Another witness saw the victim lying in the street near the emergency entrance to Children's Hospital. The woman's face was bloody and her eyes were closed. She appeared to be semi-conscious. A doctor was summoned from the emergency room at Children's Hospital, and the police were called.
The police officer who responded to the call, Officer Stewart, testified that he chased the brown Cutlass for about 15 minutes before the driver abandoned the car near Pitt and Walnut streets and started to run. A second police officer, Officer Kilbride then apprehended the driver, subsequently identified as the defendant, as he was climbing over a fence. A billy club was found on the front seat of the defendant's car. The witnesses were contacted; they positively identified the defendant as the man they had seen earlier that day.
The victim was taken by ambulance to Touro Hospital, where she was examined by Dr. Robert L. Applebaum, a neurosurgeon, who testified that the victim was too confused and disoriented to know her own name and that she was having difficulty speaking and was restless and nauseated. He found a large hematoma on the back of *321 her head, indicating that she had sustained a severe blow to her head consistent with being hit over the head with a club like the one found in the defendant's car. He determined that she had suffered a contusion to the brain and a severe concussion. Dr. Applebaum also discovered bruising and swelling around her right eye as well as swelling in her right jaw and face. The bruises to her eye area appeared to have been caused by her being hit by a fist or another hard object, he said.
Dr. John A. King, a gynecologist, conducted a rape examination upon the victim's initial admittance to the hospital. She was uncooperative in the examination, and two nurses were required to restrain her. Dr. King found no bruises in the victim's genital area, but he did find a little fluid, later determined to contain sperm, at the top and at the opening of the vagina. The victim testified that she had not had sexual intercourse with anyone in the month preceding this attack.
After Drs. Applebaum and King examined the victim, she was admitted to the Intensive Care Unit, where she was held five days before she was transferred to a private room. During that period, the victim suffered from severe swelling in her brain.
Dr. Louise Dunbar, a psychiatrist, first saw the victim on June 14, 1988, nine days after the attack. She found that the victim was suffering from "psychogenic amnesia with regression." The victim did not want to talk about the attack. Her behavior was like that of a seven- or eight-year old.
On June 21, 1988, Officer Cindy Burkhardt and an assistant district attorney visited the victim in the hospital. The hospital had refused to allow them to see her earlier because of her medical condition. At that time, the victim made a statement to Officer Burkhardt regarding the crime, to which Officer Burkhardt testified at trial. The victim told Burkhardt that the defendant opened his pants, pulled her shorts to the side, and then placed his penis next to her vagina. She was uncertain as to whether she was penetrated, but said that if she was, she was not penetrated totally.
On June 30, 1988, the victim immediatley identified the defendant as the perpetrator in a photographic line-up.
On July 28, 1988, the defendant was indicted on two counts of aggravated rape in violation of LSA-R.S. 14:42; one count of armed robbery in violation of LSA-R.S. 14:64; and one count of aggravated kidnapping in violation of LSA-R.S. 14:44. On August 2, 1988, the defendant pled not guilty to all counts. This appeal concerns only counts three and four of the indictment, one of the aggravated rape charges and the aggravated kidnapping charge. The defendant was tried on these two counts on June 30, 1989, and was found guilty as charged of aggravated rape and attempted aggravated kidnapping. He was sentenced on December 14, 1989, to life imprisonment at hard labor with credit for time served without benefit of probation, parole or suspension of sentence on the aggravated rape conviction. He was sentenced to fifty years at hard labor with credit for time served on the attempted aggravated kidnapping conviction, the sentence to run concurrently with the sentence imposed for aggravated rape and consecutively with any other sentence.

Errors Patent:
The minute entry reflects that the defense filed a motion for new trial on October 27, 1989. The record indicates that the trial judge denied a "motion to suppress" on December 14, 1989, and sentenced the defendant immediately thereafter. While it seems likely that the record is wrong and that the judge actually denied the motion for new trial rather than a motion to suppress, the record is not clear on this issue. Accordingly, the trial court is ordered to issue a per curiam to indicate whether it ruled on the motion for new trial prior to sentencing defendant. If it did not, the sentence must be vacated and the case remanded for resentencing. State v. Randolph, 409 So.2d 554, 554 (La.1981); C.C.P. art. 853.
Assuming that the motion for a new trial was denied, the record also does not indicate that defendant waived the 24-hour delay between the denial of the motion for new trial and sentencing. However, since *322 the defendant has not challenged his sentence on appeal, the sentence need not be vacated on this ground. State v. Williams, 545 So.2d 1144,1149 (La.App. 4th Cir.1989).

ASSIGNMENT OF ERROR NO. 1:
Defendant argues that Officer Burkhardt's testimony concerning the victim's statements was inadmissible hearsay. A hearing was held on the admissibility of this statement prior to trial. Based upon the testimony of Dr. Dunbar, a psychiatrist who treated the victim after the attack, the trial court found that the statement was inadmissible hearsay.
On writs filed by the State, this court found that the victim's statement to Officer Burkhardt was admissible because it constituted the "first complaint by a rape victim" and thus fell within the res gestae exception to the hearsay rule. Based upon its review of Dr. Dunbar's testimony, the writ panel concluded that the victim during her "initial convalescent period ... was unable to respond to questions about the attack because of the apparent brutal beating, and because the victim regressed to a child-like state." "Under these extraordinary facts," the victim's statement was given "at the first reasonable opportunity," the writ panel concluded.
The defendant argues on appeal that the writ panel's conclusion was erroneous because new evidence presented at trial, in the form of the testimony of the victim and the police officer, proves that the res gestae exception does not apply. Specifically, the defendant argues that the testimony presented at trial indicates that the victim's statements to Officer Burkhardt were not spontaneous. Additionally, the defendant contests the writ panel's conclusion because of the "unexplained lapse of time" between the alleged crime and the victim's statements to the police officer. Res gestae statements must be spontaneous and must occur with no unexplained lapse of time. State v. Elzie, 351 So.2d 1174, 1175 (La.1977); State v. West, 553 So.2d 945, 947 (La.App. 4th Cir.1989), writ denied 558 So.2d 567 (La.1990). Thus, the defendant argues, the statements were inadmissible hearsay.
When this court considers a question of admissibility of evidence in a supervisory writ application in advance of trial, the conclusions reached by the writ panel are not binding on the judges who later consider the case on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. State v. Humphrey, 412 So.2d 507, 523 (La.1982) (on reh'g). However, this court gives great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result. Humphrey at 523; State v. Carroll, 546 So.2d 1365, 1366 (La.App.1989). For the reasons which follow, we find that the admission of the police officer's testimony was not patently erroneous and it did not produce an unjust result.
When the case was tried in 1989, admission of evidence was controlled by the new Louisiana Code of Evidence, which went into effect January 1, 1989. Therefore, this case is not controlled by the former rules governing the admissibility of hearsay and the exceptions to those rules, including the res gestae exception. Thus, we pretermit determination of whether the statements in question were in fact res gestae and consider only whether the statements were properly admitted under the new code.
Under LSA-C.E. Art. 801(C), hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." LSA-C.E. Art. 801(D) defines several types of prior statements by a witness which are not hearsay. One type of statement not recognized as hearsay under this article is one which is "[c]onsistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior." La.C.E. art. 801(D)(1)(d). In all of the circumstances described as non-hearsay under this rule, the declarant must testify at trial and be subject to crossexamination concerning the statement.
Relevant to the rule admitting complaints of sexually assaultive behavior, the *323 comments to Rule 801(D)(1)(d) state as follows:
Part (d) of Subparagraph (D)(1) clarifies prior Louisiana law. Louisiana courts recognized the admissibility of complaints of sexually assaultive behavior but did not articulate a consistent theory of admissibility.
The reasons for the adoption of new rules concerning admission of complaints of "sexually assaultive behavior" have been addressed by a number of commentators. Those statements were formerly admissible only if they met the requirements for res gestae, as it was formerly defined by LSA-R.S. 15:447-448 repealed by Acts 1988, No. 515 (effective Jan. 1, 1989). In Louisiana, as in other states, the res gestae concept was relatively vague. This vagueness "made it easier for courts to broaden its coverage and thus provide for the admissibility of certain statements in new situations," including the admissibility of statements concerning sexually assaultive behavior. McCormick on Evidence, § 288 at 836 (3d ed. 1984). The law has now reached a stage at which widening admissibility of these statements will best be served by more consistent and precise means. Id. Art. 801(D)(1)(d) accomplishes this purpose by eliminating the restraints on admissibility inherent in the res gestae exception.
Under the res gestae exception as it was developed in Louisiana and common law jurisprudence concerning rape prosecutions, the state was required to show there was no unexplained lapse of time between the rape and the victim's complaint. Elzie at 1175; West at 947. The courts have, in essence, required the State to "explain away" a period where there is lack of a complaint, i.e. a silence, "as due to fear, shame, or the like, so that the silence loses its significance as a suspicious inconsistency." IV J. Wigmore, Evidence, § 1135 (Claibourne Rev.1972).
Under LSA-C.E. Art. 801(D)(1)(d), the "initial" complaint of the victim of sexual abuse is admissible as substantive evidence. "The initial complaint need not be `prompt'; delay in making the complaint does not affect admissibility. Instead delay is to be weighed in assessing the credibility of the witness." Graham, "The Cry of Rape: The Prompt Complaint Doctrine and the Federal Rules of Evidence," 19 Willamette L.Rev. 489, 510 (1983). (Cited in the initial comments to Acts 1988, No. 515, but omitted from the official comments to the code.)
Additionally, in Louisiana jurisprudence concerning the res gestae exception, the State was required to show that the victim's complaint was uttered spontaneously. Elzie at 1175; West at 947. However, LSA-C.E. Art. 801(D)(1)(d) by its own terms, constitutes a rule of admissibility separate and distinct from LSA-C.E. Art. 803(2), which provides for admission of an out-of-court excited utterance as an exception to the hearsay rule. The excited utterance rule admits an out-of-court "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." LSA-C.E. Art. 803(2). Accordingly, under LSA-C.E. Art. 801(D)(1)(d), the State is not required to show that the out-of-court complaint by the sexually assaulted victim was uttered spontaneously or in excitement.
Under Art. 801(D)(1)(d), the victim must testify at trial consistently with the content of the initial complaint and be subject to cross-examination. These requirements alleviate the reliability problems inherent in ordinary hearsay. Graham, supra, 19 Williamette L.Rev. at 511. If, for any reason, the victim failed to testify consistently, for example, by either inexplicably failing to recall the event or by testifying to a version that differs from the alleged initial complaint, the initial complaint would fail to meet the requirements of the rule. Id. In this case, the victim did not fail to recall the event itself, although she did fail to recall some of the details of the event. Thus, the police officer's testimony would qualify under the rule, if it is consistent with the victim's in-court testimony and if it qualifies as the "initial" complaint of the crime.
*324 We find that the victim's statement to Officer Burkhardt on June 21, 1988 was consistent with her in-court testimony regarding her pre-attack actions and the events of the attack; additionally, the victim gave additional information to the police officer regarding the details of the actual attack. The victim told Burkhardt that the defendant opened his pants, pulled her shorts to the side, and then placed his penis next to her vagina. She did not remember whether she was penetrated, but said that if she was, she was not totally penetrated. The victim's trial testimony indicates that she did not recall being penetrated during the attack, nor could she recall telling anyone that she had been penetrated. Although the victim failed to testify at trial about certain portions of the actual attack, that failure is explained by her psychiatric condition after the attack. The existence of additional information in a prior out-of-court statement, all other statements being consistent, does not render the witness' testimony inconsistent for purposes of Art. 801(D)(1).
The second inquiry under LSA-C.E. Art. 801(D)(1)(d) is whether the victim's prior statement was "an initial complaint of sexually assaultive behavior." The victim's complaint to the officer was made sixteen days after the attack. The fact that the complaint is not promptly made does not affect admissibility, but must be weighed in assessing the credibility of the witness. Id. However, we must first determine under the facts and circumstances of the case, including the psychiatric condition of the victim, whether the victim's complaint to the officer was in fact her "initial" complaint.
At trial, Dr. Dunbar testified that she first saw the defendant nine days after the attack and that the victim did not want to talk to her about the attack. Dr. Dunbar found that the victim's behavior was regressed and was consistent with that of a seven- or eight-year old. Dr. Dunbar diagnosed the victim as suffering from "psychogenic amnesia with regression." Dr. Dunbar continued to see the victim regularly, including the time period from June 14 to June 21, the date on which the victim gave a statement to Officer Burkhardt concerning the attack. During that time period, the victim still did not want to talk about the attack. It was not appropriate, in Dr. Dunbar's opinion, to press the victim to talk about it for fear that to do so might cause the victim to regress further.
At trial Officer Burkhardt testified that she was first notified of the case five days after the attack occurred, but the Touro Hospital Medical staff would not allow her to talk to the victim because of her medical condition since she was frequently unconscious. Officer Burkhardt visited the victim on the first day Dr. Dunbar allowed it. On that visit, the victim appeared tired and did not make eye contact with her, then fell asleep. Officer Burkhardt left and returned the next day with an assistant district attorney. The victim gave a statement to them concerning the attack. The victim had not discussed the attack with anyone prior to that date, to Officer Burkhardt's knowledge.
While sixteen days may constitute a lengthy delay, the victim's child-like state and traumatic condition, coupled with the doctor's refusal to allow anyone to talk to the victim about the attack, convince this court that the statement to Officer Burkhardt was the victim's "initial" complaint of the "sexually assaultive behavior" and that the complaint was timely. The jury obviously considered the delay in assessing the credibility and reliability of the victim's statement to the officer and in finding the defendant guilty on both charges.
For the foregoing reasons, we find that Officer Burkhardt's testimony concerning the victim's statement was properly admitted under the applicable articles of the Code of Evidence. Thus, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2:
The defense contends that insufficient evidence was presented by the State to convict the defendant of aggravated rape and attempted aggravated kidnapping.
When reviewing for sufficiency of the evidence in a criminal case, Louisiana appellate *325 courts are bound by the United States Supreme Court mandate in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a determination of whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Mussal, 523 So.2d 1305, 1308 (La.1988); State v. Heck, 560 So.2d 611, 614 (La.App. 4 Cir.), writ denied 566 So.2d 395 (La.1990).
LSA-R.S. 14:42 sets out the elements of aggravated rape. It provides, in pertinent part, as follows:
A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances: (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
At the time of trial, LSA-R.S. 14:41 defined rape, in pertinent part, as follows:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person who is not the spouse of the offender, committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
The defense argues that the circumstantial evidence used to convict the defendant was insufficient to prove that the fluid found at the top and on the opening of the victim's vagina was the defendant's seminal fluid, and that the State failed to prove that the victim was actually penetrated by the defendant.
Our review of the record convinces us that the State met its burden of proving, beyond a reasonable doubt, that the fluid found on the victim came from the defendant. The fluid was identified by a chemistry supervisor at Touro Hospital as spermatozoa; however, it was of such a small quantity that a proper DNA test could not be used to link the fluid with the defendant. A friend of the victim testified that she had been out with the victim the night before the attack and that the victim was not with a man at any time during the night. Additionally, the victim had a female roommate at the time of the attack. The victim testified that she had not had sex the night before the attack, nor within the past month. Finally, the defendant was the last male who the victim was with and the fluid was found on the victim immediately after the defendant attacked her.
We are also convinced that the State met its burden of proving that penetration "however slight" occurred. Dr. King, who performed the rape test on the victim, testified:
BY MS. OFFAN:
Q: Doctor did you note any fluid?
A: Very little. In the top of the vagina and on the opening of the vagina.
Trial transcript, page 84.
Q: Doctor, in your experience, is there any way for semen to be inside the vagina, other than a penis placing it there?
A: Well, medically, it can be done in artificial insemination, that's the only other way.
Trial transcript, page 88.
This testimony proves that the fluid found on the top of and at the opening of the victim's vagina was actually "inside" the victim's vagina; therefore, it is sufficient to prove that actual penetration occurred.
Officer Burkhardt testified that the victim told her that the defendant opened his pants, pulled her shorts to the side and then placed his penis next to her vagina. Officer Burkhardt also testified:
I asked her if she remembered being penetrated. She did not remember definitely if she was penetrated; but that if she was, she was not penetrated totally, as far as her recollection.
When viewing this evidence in the light most favorable to the State, we conclude that the State met its burden of proving penetration, "however slight," beyond a reasonable doubt.
The evidence also supports the conclusion that all the other requirements for a *326 conviction for rape were present. First, the evidence shows that the intercourse was not consensual because the victim resisted the act to the utmost, but her resistance was overcome by force. The testimony of the victim and the witnesses in the area establish this fact beyond a reasonable doubt. The victim remembered the defendant holding her neck and leaning toward her after she was forced into the defendant's car, and her screaming for help and pounding on the dashboard to no avail. Witnesses in the area testified that they heard her screams for help and that they saw the victim hanging out of the defendant's car, bleeding profusely. These facts support the conclusion that the victim resisted to the utmost.
Second, the evidence demonstrates that the victim's resistance was overcome with force. The victim sustained a severe blow to the head consistent with being hit by a club, such as was found in the defendant's car. She suffered a contusion and severe concussion and, as a result, suffered a memory loss regarding the crime. She was semi-conscious when found and did not know her own name. She had bruises on her face, consistent with being punched in the face. She was in the Intensive Care Unit for five days and in the hospital even longer. Thus, all the necessary elements to convict the defendant of aggravated rape were presented.
The defense also contends that insufficient evidence was presented to convict the defendant of attempted aggravated kidnapping. Specifically, the defense asserts that insufficient evidence was presented to prove that the victim gave up something of value as a condition of her release.
Aggravated kidnapping is defined by LSA-R.S. 14:44, the elements of which are set forth in State v. Arnold, 548 So.2d 920 (La.1989). They are:
1. The forcible seizing and;
2. the carrying of any person from one place to another (the asportation element);
3. with the intent to force the victim, or some other person, to give anything of apparent present or prospective value (the extortion element);
4. in order to secure the release of that person.
Id. at 923.
In this case, the first element was met, as the victim was seized and thrown into defendant's car. The second element was also met, as the victim was transported from one location to another. Additionally, despite the defendant's contentions to the contrary, the third element was also met. The abduction of a victim with the intent to commit rape constitutes an intent to force the victim to give up something of apparent value. Id. at 923; State v. Rault, 445 So.2d 1203, 1213 (La.1984), cert. denied, Rault v. Louisiana, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984).
At issue is whether the fourth element was satisfied: whether the defendant forced the victim to have sex with him as a condition of releasing her. The Louisiana Supreme Court addressed this particular issue in Arnold, 548 So.2d 920. In Arnold, the defendant grabbed the victim as she was unlocking her car door, forced her to get into his car, and drove off. As he was driving, the defendant prevented the victim's escape, holding her down on the seat by the hair and threatening her with a knife. The defendant stopped in the parking lot of an apartment complex and told the victim to remove her pants and underwear. He then attempted to vaginally rape her three times, but was unable to achieve penetration. Consequently, he forced her at knife point to perform oral sex on him. He then stuck a towel in her mouth and told her to leave. As she tried to do so, he grabbed her by the hair and stabbed her in the neck. The victim pulled the knife from her neck and ran off.
The defendant in Arnold was convicted of attempted aggravated rape, aggravated crime against nature, attempted second degree murder, and aggravated kidnapping. The appellate court reversed the aggravated kidnapping conviction, finding no evidence to prove that the defendant had forced the victim to have sex with him for the specific purpose of securing her release. *327 The Louisiana Supreme Court reversed, finding that sufficient evidence existed to support the conviction, stating that the relevant factor was not whether the defendant explicitly told the victim that having sex with him would secure her release. Instead, the issue was whether the kidnapper "sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim's fear and hope of eventual release in order to gain compliance with his demands." Id. at 925.
In the instant case, the victim was forcibly seized, hit in the head, and forced into the defendant's car. The defendant hit the victim repeatedly, holding her head down as she screamed for help. He raped her, then ordered her out of the car. Under these circumstances, as in Arnold, any reasonable person would comply with the defendant's demands in the hope of securing a release. The victim was in fact released once the rape occurred. Thus, sufficient evidence exists to support defendant's attempted aggravated kidnapping conviction. Therefore, this assignment of error is without merit.

CONCLUSION:
The defendant's conviction for aggravated rape is affirmed. The defendant's conviction of attempted aggravated kidnapping is affirmed.
The trial court is ordered to issue a per curiam concerning whether it ruled on the motion for new trial prior to sentencing. If the trial court denied defendant's motion for a new trial prior to sentencing defendant, the sentence for aggravated rape and attempted aggravated kidnapping is affirmed. If the trial court did not deny defendant's motion for new trial prior to sentencing, it is ordered that the sentence for aggravated rape and attempted aggravated kidnapping be vacated and that the defendant be resentenced.
AFFIRMED AND REMANDED.