11 SEXTON, Judge.
Defendant, Larry Dale Lilley, was charged with three counts of indecent behavior with a juvenile, in violation of LSA-R.S. 14:81. A jury found Lilley guilty of one count of attempted indecent behavior with a juvenile, and the court sentenced him to serve three years at hard labor. From this conviction and sentence he now appeals, urging three assignments of error. We affirm.
FACTS
Defendant, Larry Dale Lilley, was originally charged with three counts of indecent behavior with Celeste Battlefield, one of the juvenile daughters of his ex-girlfriend, Connie Battlefield. Defendant and Connie Battlefield dated between January 1987 and September 1991, the time period in which the alleged incidents in question occurred. After a trial by jury, Lilley was acquitted on counts one and three and was found guilty of attempted indecent behavior with Celeste Battlefield on count two. The relevant testimony and facts relating to the three counts is as follows.

Count 1: January 1, 1987 to June 30, 1988

From 1986 until the summer of 1988, Ms. Battlefield and her daughters lived in the Village Manor apartments in Haughton. Celeste Battlefield, bom July 7, 1981, testified that while the family lived in these apartments, the defendant behaved inappropriately toward her on two occasions. The first incident took place on the couch at the apartment. The victim said that she, her mother, and the defendant were all sitting on the couch watching TV. As they sat, the defendant put his hand inside the back of Celeste’s shirt and pants.
The second incident during this time period, which took place at Tilley’s home, was described as follows:
A: [W]e were all sitting on the couch, and me and my mom and my sister were playing with some Speak and Spells and he [the defendant] come over. And uh — he asked — asked us if we wanted some Speak *1366 and Spells that he had over at his house. And me, him, and my mama and my sister went over to his house and we — and Diana and Starla were there. And we all went in a — in a^bedroom and were looking for the Speak and Spells. And uh — then my mama and Diana and Starla and everybody but me and him left. And I was looking under the bed and he told me that I had a bug in my private part, and he picked me up and laid me on the bed and took off my pants or shorts and my panties.
Q: Did he do anything to you at that time? Did he touch you in anyway?
A: I don’t remember.
Count ¾: July 1,1988 to March 80,1990
In July or August 1988, the Battlefields moved into a home in the Oak Meadow subdivision in Haughton; they moved away to Dallas in March, 1990. Only one incident occurred during this time period. Celeste said that she was about 8 years old when this happened. The child described it this way:
A: I remember Diana was giving me and Starla and Carla a bath all in the same bathtub, and I got out of the bathtub first. And I had my own room and I went to my room with just a towel around me. And he — uh—I went — he came in behind me and he shut the door and he told me that he wanted to help me get dressed, and I told him no. And I told him to leave, and then he left.
Q: Did he touch you at any time during that time?
A: I don’t remember.
On cross-examination:
Q: Okay. Now the third incident that you described, if I’m not mistaken, happened at a house in the Oak Meadow Subdivision when you got out of the bathtub and you had a towel on.
A: Yes, sir.
Q: And you went into your room?
A: Yes, sir.
Q: And he came in behind you?
A: Yes, sir.
Q: Closed the door?
A: Yes, sir.
Q: And asked if he could help you get dressed?
A: Yes, sir.
| sQ: Did you say no?
A: Yes, sir.
Q: Okay. And then he left?
A: Yes, sir.
Q: He didn’t touch you?
A: No, sir.
Q: You didn’t take your towel or [sic] nor did he take it off?
A: No, sir.
And, later on cross-examination:
Q: On this occasion when you were wearing the towel in the Oak Meadow Subdivision is it possible that Mr. Lilley came to the door and your door to your bedroom was open and he closed the door and asked you to get dressed?
A: Well, he walked in right behind me before I could have a chance to shut the door.
Q: Okay. Is it possible that he asked you to get dressed and shut the door?
A: No, sir.
Q: You remember that he asked if he could help you get dressed?
A: Yes, sir.
Q: And you said no, and then he shut the door and left?
A: Yes, sir.
And, on re-direct examination:
Q: Regarding the incident with the towel, were you at any time scared to have Larry Lilley in the room with you?
A: No, sir.
*1367 [[Image here]]
Q: Let me ask you in particular if you told Johnnie Covington uh — let’s talk about the incident on the towel. Let’s just stay with that for a minute. Do you remember telling Johnnie Covington that Larry Lilley had put his finger in your vagina?
A: No, sir.
Q: You just don’t remember telling her that?
A: No, sir.

Count 3: June 1, 1991 to September 30, 1991

The child testified to the following:
I4A: On the fourth of July I remember we were popping firecrackers, and he came over and he picked me up from underneath, uh — on my private part. He picked me up by that.
Q: Can you tell the jury where exactly he picked you up?
A: On the vagina.
On cross-examination:
Q: Did he have his other hand on your shoulder or on your head or your arm or what?
A: No, he had it around my waist.
Q: Around your waist?
A: Yes, sir.
Q: Okay, so he kind of just picked you up like this?
A: Yes, sir.
Q: All right. Where did he take you after he picked you up?
A: We just stayed right there. He picked me up and then he put me down and he went and hugged my mom and my sister.
Q: Okay. When he picked you up, how long did he have you in his arms?
A: Probably about just five minutes.
Q: Okay. Did he do anything to you while you were in his arms?
A: No. No, sir.
Q: Did he fondle you or rub you or anything like that?
A: No, sir.
While watching a television program with her grandmother and sister depicting the sexual abuse of a little girl, the victim told her grandmother “that same thing that happened to that girl had happened to me.” When Celeste’s mother returned home, her grandmother told her mother what Celeste had said. Celeste told her mother about the incident where the defendant purported to look for a bug in her vagina. Celeste did not relate any of the other incidents. The child’s mother did not believe her allegation and did not investigate further. However, she testified that the incident with the towel could have happened:
| SQ: Do you remember any incidents during the time you lived in the ... Oak Meadow subdivision where your daughter had a towel and Mr. Lilley was in her proximity?
A: Yes, sir.
Q: Would you relate to the jury what you know about that incident?
A: I was in the kitchen, both the girls were in the bathtub, Larry was there. Uh — he walked in the bathroom first on both the girls and they screamed real loud so he shut the door. And uh — when I went back there to see what was going on, what was wrong with the girls, he was standing outside the door. And I said what are you doing? He said, well, I didn’t know they were in the bathtub. And I said, well, stay out of there. He says, well, they’re just little girls, you know. And I said, well, you need to stay out of there. They’re taking a bath. So he came back into the living room and I went back into the kitchen.
Q: Were you able to see what he did after that once you went into the kitchen?
A: No, I assumed he stayed in the living room.
*1368 Several months after the TV program, on March 10,1992, Bossier Parish Deputy Sheriff Johnnie Covington decided to interview Celeste. Deputy Covington had spoken with Starla Roberts, Lilley’s juvenile niece, and had learned that Celeste might have been the victim of sexual abuse. Over the defendant’s prior objection, the deputy testified that in their interview, Celeste had given a considerably more graphic version of the encounters. As to the towel incident of which the defendant was convicted, the deputy testified:
A: [Celeste] described another incident which happened in the Oak Meadow Subdivision which is also in Haughton off of Highway 157. And she said that she had just gotten out of the bathtub and was dressed in nothing but a towel or had a towel wrapped around her. And that Larry Lilley came into her bedroom and said that he wanted to help her get dressed, and that while there he had put his finger in her vagina.
Q: Did she say that he had made any comments at that time?
A: He told her that he would buy her a nice present or something that she wanted.
The deputy wrote out a history of this and the other incidents for Celeste’s physician and, the next day, interviewed the defendant. On that occasion, the defendant denied leany wrongdoing. Based on the information they had, the Bossier Sheriffs office arrested Lil-ley after this interview.
On April 8, 1992, defendant’s father called the deputy and arranged for the defendant to meet with the deputy. The deputy testified that, at this meeting, Lilley told her that he wanted to “change his plea to guilty” and that he had behaved “inappropriately” with the victim. Specifically, the deputy related:
He told me that when Celeste Battlefield and her mother lived in the Oak Meadow Subdivision uh — that he remembered touching Celeste’s vagina without her having any clothes on and that he had promised to buy her a nice present if she wouldn’t tell on him.
The deputy also testified that Lilley admitted the “bug” incident and another incident during which he claimed to have been sexually aroused.
The defendant testified and denied any wrongdoing or misconduct with Celeste Battlefield. Regarding the towel incident, he testified:
Q: Okay. When [Celeste] and her mother were living in the Oak Meadow subdivision, do you recall an occasion when she was taking a bath at that residence?
A: Uh — yes, I do.
Q: Okay. Did you come into contact with Celeste at all either while she was taking a bath or when she got out of the bathtub?
A: Uh — her mother told me to tell the girls to hurry up. We was going out to dinner. She told me to tell the girls to hurry up. I opened the door to tell them to hurry up and the youngest one, Carla, screamed, which they was in bubble bath, and I hurried and shut the door, and she laughed. She goes, yeah, you can’t go in there with her ‘cause she’ll scream. She’ll scream like crazy.
Q: That’s Celeste’s younger sister, Carla? A: That’s Carla. That’s the youngest.
Q: All right.
A: And I shut the door and told them through the door to hurry up. And — and when they got out she — uh—Connie [the girls’ mother] was in the kitchen. Okay, when they got out Celeste walked into the room and I was — I was in the living room, and Connie was in there drying Carla off because she was younger.
LQ: Okay.
A: And I went to tell Carla, I mean Celeste, to hurry up, opened the door and just told her to hurry up and get dressed. And she had a towel on her, and she had a towel on just from here on down, and I startled her, and I left the room. I shut the door and walked out.
Q: She had the towel around her at all times?
*1369 A: Uh — well she had it down to here and then she held it up to here. She was like only nine years old though.
Q: I understand.
A: I just told her to hurry up and get dressed.
Q: I understand.
A: That’s all I told her.
Q: You did not see any of what we might call her private parts?
A: No, no, I did not see that.
Q: And you did not touch her on that occasion?
A: Uh — I did not walk in the room.
Q: Did you touch her?
A: No.
The defendant explained that his statements to the deputy were made under the impression that the charges against him would be reduced to a misdemeanor if he pled guilty. He said that his father told him that this would be the case. Deputy Covington admitted that she might have discussed the matter peripherally with the defendant’s father. Lilley said that the deputy’s report of the incidents was “jacked up” to make the state “look good.”
Dr. Tony Alleman, the Battlefield family physician, was called as a witness by the state. The medical history in the doctor’s report says that “Lilley has on numerous occasions fondled [Celeste’s] buttocks” and “Lilley has also put his finger in her vagina.” The doctor testified that this medical history was written by Deputy Covington based on her March 10, 1992, interview with the child. The doctor noted that the child’s hymen was intact but said that this would not necessarily be | ginconsistent with some kinds of vaginal penetration. The doctor’s testimony was as follows:
Q: Did you come to any opinions regarding any abuse or neglect in this case?
A (Doctor): My findings were that there were no physical findings to uh — support a uh — any trauma by sexual abuse. However, uh — the child’s — what the child told me was that uh — gave me reason to believe that there was actually some fondling that took place. And the physical findings supported the fact that fondling may have taken place in the sense that there was no other physical findings present.
The doctor testified that Celeste had been his patient for “quite some time” but had never before complained of sexual abuse. Further, although the doctor said he “interviewed Celeste myself,” he testified:
Q: Did [Celeste] ever make any other statements to you other than the statement that is alleged to be hers in your history?
A: No, sir.
Q: Never has mentioned it again?
A: No, sir.
Dr. Alleman was the only doctor to testify at the trial.
DISCUSSION
Defendant appeals, urging three assignments of error. He first argues that the trial court erred in allowing the admission, over defendant’s objection, of the statement made by Celeste Battlefield to deputy Johnnie Cov-ington on March 10, 1992, secondly, that the evidence presented at trial was insufficient to convict him of attempted indecent behavior of a juvenile and that his sentence of three years is excessive.
In State v. Hearold, 603 So.2d 731 (La.1992), the Louisiana Supreme Court stated that when issues are raised on appeal both as to sufficiency of the evidence and trial errors, the reviewing court should first determine the sufficiency of the evidence. Defendant contends the trial court improperly allowed the jury to hear inadmissible | ¡¡hearsay testimony. In determining whether the evidence was sufficient to convict, the court may consider this alleged hearsay. In Hearold, the court stated:
When the entirety of the evidence, including inadmissible evidence which was erro *1370 neously admitted, is insufficient to support the conviction, the accused must be discharged.
603 So.2d at 734. See also Lockhart v. Nelson, 488 U.S. 33, 41-42, 109 S.Ct. 285, 291, 102 L.Ed.2d 265 (1988), and State v. Tucker, 619 So.2d 1076 (La.App. 1st Cir.1993).
Assignment of Error 2: There is inadequate evidence proving that the defendant was guilty of the offense of Attempted Indecent Behavior with a Juvenile.
We first then proceed to determine whether the entirety of the evidence, both admissible and inadmissible, was sufficient to support the conviction. When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982). LSA-R.S. 14:81(A) provides:
Indecent behavior with juveniles is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child’s age shall not be a defense.
To convict a defendant of indecent behavior with a juvenile, the state must prove (1) that the defendant was over the age of seventeen and more than two years older than the victim, who was not yet seventeen; (2) that the defendant committed a lewd or lascivious act upon the person or in the presence of the victim; and (3) that the defendant committed the act with the specific intention of arousing or gratifying the sexual desires of either himself or the victim. An attempt to commit this crime liprequires proof that the defendant had a specific intent to commit the crime and performed an act tending directly toward its accomplishment. LSA-R.S. 14:27.
In this case, the evidence against the defendant consisted primarily of the testimony of the child and her doctor and the testimony of Deputy Covington about what the child had said. Also included in the evidence was defendant’s confession given to Deputy Covington on April 8, 1992. Deputy Covington testified that Lilley told her on April 8th, that, during the relevant time period, he had touched the child’s vagina and promised to buy her a present if she did not tell anyone. The child’s mother’s testimony tended to prove that the defendant had the opportunity to commit the crime. It does not assist the state further. The doctor who examined Celeste found no physical evidence of sexual abuse. However, he testified that the absence of such evidence did not indicate that no abuse had occurred. His opinion, however, was based on the history he was given by the deputy.
Deputy Covington also testified that the child told her that the defendant had entered the room of the child, shutting the door behind him and asked the girl to help her dress. Covington indicated that Lilley removed the towel and inserted his finger in her vagina. Celeste informed Deputy Cov-ington that he promised to buy her whatever she wanted.
The child testified at trial that defendant did in fact enter her room and asked to help her get dressed. She first indicated that she did not remember if he had touched her, but later testified that he did not touch her. She also consistently indicated that he shut the door behind him after entering her room.
When viewed in the light most favorable to the state, we find this evidence sufficient. This evidence demonstrates that defendant entered the child’s room on the day in question with the intent to commit the *1371 crime of indecent behavior with a juvenile and did an act in furtherance thereof.
_J_nAssignment of Error 1: The trial court erred in allowing the admission, over defendant’s objection, of the statement made by Celeste Battlefield to Deputy Johnnie Covington on March 10, 1992.
In light of our determination that the evidence was sufficient to convict, we will address defendant’s remaining assignments of error. Defendant complains that the testimony of Deputy Covington relating to the statements made to her by Celeste Battlefield were erroneously admitted, after defense objection, as inadmissible hearsay. The state argues, and the trial court agreed, that the statements were not hearsay because of LSA-C.E. Art. 801(D)(1)(d), which provides:
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(d) Consistent with the declarant’s testimony and is one of initial complaint of sexually assaultive behavior.
Comment (e) to that article provides:
The approach taken under Part (d) of sub-paragraph (D)(1) minimizes confrontation problems. See Note, 40 La.L.Rev. 1036 (1980). It is only the initial complaint by the victim, whether made to a family member, policeman, or other person, that is defined as non-hearsay under this provision. Subsequent complaints or reports about the same crime would not be admissible under it. This may change Louisiana law.
Defendant argues that because Celeste Battlefield’s testimony was inconsistent with the statement she gave to Deputy Covington and that the statement to Deputy Covington was not the initial complaint of the child as she had reported the incident to her grandmother at an earlier date.

1. Consistency of Testimony

On direct examination, the child said that she did not remember whether Lilley had. touched her while she was wearing the towel. She later said again that she did not remember and finally stated that Lilley did not touch her on this occasion. On the other hand, the deputy said that the little girl told her that Lilley had “put his finger in her vagina” during this episode.
|12Defendant cites State v. Moran, 584 So.2d 318 (La.App. 4th Cir.1991), writ denied, 585 So.2d 576 (La.1991), in support of his argument that the statements made by Celeste were not consistent. In Moran, the defendant kidnaped, beat and raped a 24-year-old woman. The woman was badly injured by blows to the head and for about two weeks after the attack suffered from “psychogenic amnesia with regression.” This condition caused her to behave like a 7 or 8 year old and to refuse to discuss the attack. When the condition subsided, the victim gave a statement to police in which she related the facts of the rape and identified her attacker. She told the police that “she was uncertain as to whether she was penetrated, but said that if she was, she was not penetrated totally.”
At trial, her testimony indicated “that she did not recall being penetrated during the attack, nor could she recall telling anyone that she had been penetrated.” The court noted that this testimony was essentially consistent with her statement as recited by the police. The court also opined that:
The existence of additional information in a prior out-of-court statement, all other statements being consistent, does not render the witness’ testimony inconsistent for purposes of Art. 801(D)(1).
(Record page 324; emphasis added.)
The trial court in this case cited Moran in support of its finding that Celeste’s statements were consistent. The court noted:
*1372 [T]he existence of additional information in a prior out-of-court statement, all other statements being consistent does not render the witness’ testimony inconsistent for purposes of Article 801(D)(1). Well, you’re dealing with a youthful witness. It’s not surprising that most witnesses’ statements have some details that are inconsistent. It’s not unusual anyway, and I think even more so when you’re dealing with a youthful witness in a very sensitive area or type of testimony as this is. So I find that ... this statement does meet the criteria [of consistency].
We find this case distinguishable from Moran. In Moran, the victim simply was unable to remember what transpired during the crime. That testimony remained consistent listhrough her testimony at trial where she remained unclear on the issue of penetration. In this case, the child’s testimony was different than that recited by the deputy. At trial, the child ultimately denied that defendant had touched her. The deputy directly contradicted this testimony with the strongly incriminating interview statement. This testimony of the child constituted more than a mere detail or additional information. It created an inconsistent version of the facts and constituted inadmissible hearsay evidence which should have been excluded.
Moreover, we have a serious question as to whether the child’s statement to Deputy Cov-ington was indeed her “initial complaint” as contemplated by LSA-C.E. Art. 801(D)(1)(d). On their face, the facts contradict this conclusion. Celeste said that she first told her grandmother that the defendant had sexually abused her. The record contains no details about what the child told her grandmother.
Celeste’s mother did not mention whether the grandmother told her anything. However, she said that she and Celeste had talked about sexual abuse after the TV show several months before Celeste talked to the deputy. The mother testified that, on this occasion, Celeste had told her only about the incident where the defendant purported to look for a bug in her vagina.
In finding that the child’s initial complaint was made to the deputy, the trial court cited State v. Garay, 453 So.2d 1003 (La.App. 4th Cir.1984). In Garay, the defendant, a nursery school worker, was convicted of indecent behavior with a juvenile. His 5-year-old victim, Brenda, testified that Garay “put his ‘thing’ up in her on the bottom of her behind, and it would hurt.” Brenda made “vague statements” about the defendant to some of the workers at the nursery school, but “the workers never really sat down with her and asked her about it.” One of the workers finally did ask the child about the defendant, and the child then related in detail how she was abused.
| uGaray challenged the testimony of the concerned worker at trial as hearsay. The trial court admitted the testimony under the old law of evidence concerning such statements, which had its roots in the res gestae exception. The appellate court cited that rule at p. 1007:
The Louisiana Supreme Court has repeatedly interpreted this provision to admit the original complaint of a young child when the particular facts and circumstances of the case indicate that it was a product of a shocking episode and not a fabrication. The original complaint of the young child is the statement made at the first reasonable opportunity under the particular facts and circumstances of the case.
[[Image here]]
A very young child raped by an adult standing in the position of parent, caretaker or friend cannot be expected to immediately come forward with a complete and exact report of the event. The courts have recognized that the child may be unable to speak about the incident until she considers herself safely in the presence of a compassionate adult whom she can trust. Because the child has no clear understanding of what has been done to her, her “original complaint” often consists of responses to questioning of a patient, persistent adult who draws the child’s story from her.
*1373 Although the court’s points were valid at the time, the comment to LSA-C.E. Art. 801(D)(1)(d) notes that the new evidence provision, which is not based on res gestae, is intended to allow only the initial complaint into evidence and “may change Louisiana law.” This seems to strike at the heart of the instant case. The current rule says nothing about the “first patient, persistent adult.”
In summary, the statement clearly does not qualify as a “consistent one” and may well not be the initial complaint.
Because we find error in the admission of the statements, we must next determine whether that error was harmless.
LSA-C.Cr.P. Art. 921 provides:
A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.
| iSIn order for this court to conclude that the admission of the deputy’s testimony about the victim’s statement was harmless error, the court must find beyond a reasonable doubt that the hearsay did not contribute to the verdict. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), rehearing denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); State v. Smith, 600 So.2d 1319 (La.1992). Or, as stated in Sullivan v. Louisiana, 508 U.S. 275 at 279, 113 S.Ct. 2078 at 2081, 124 L.Ed.2d 182 (1993):
Harmless-error review looks ... to the basis on which “the jury actually rested its verdict.” ... The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.
In this case, we find the admission of the hearsay statements of the deputy to be harmless error. As noted above, the evidence presented in this ease consisted of the testimony of the child, her mother, the physician who examined the child, the defendant, and Deputy Covington. The mother’s testimony demonstrated the opportunity for the crime to have taken place. The physician’s conclusions were based upon the information Deputy Covington gave him. Of course, the defendant denied committing the crime at trial, but confessed to Deputy Covington at an earlier date.
The child’s testimony at trial denied the touching. However, her remaining testimony was consistent with what she had told Deputy Covington, i.e., that the defendant entered the room where she was dressing and asked if she needed help and that defendant shut the door behind him while inside the room. The jury verdict of the attempted indecent behavior inherently concludes that the child had not been touched. Therefore, it appears the jury did not credit that evidence. The remaining part of what she told Covington was redundant and could not have prejudicially | K¡affected the verdict. Therefore, the information regarding the “first report,” with the exception of the allegations of touching was cumulative of the child’s testimony at trial.
The jury here found that the actions of defendant in entering the room and asking the > girl if she needed help dressing and shutting the door behind him was sufficient to establish the requisite intent and an act in furtherance thereof. Further, defendant’s confession certainly corroborated the fact that he entered the room with the intent to commit a lewd and lascivious act upon the child for his sexual gratification and an act in furtherance thereof. As we noted earlier, these actions, along with evidence of the position of power which defendant exercised over the child and evidence of other questionable activities surrounding defendant’s relationship with her, were demonstrated independently of the hearsay testimony of Deputy Covington.
In light of the cumulative nature of the hearsay statement, we determine that the verdict rendered in this case was “surely *1374 unattributable” to the erroneously admitted statements of Deputy Covington, and the state of Louisiana has succeeded in demonstrating that beyond a reasonable doubt this information did not contribute to the verdict.
Assignment of Error No. 3: Defendant’s sentence of three years at hard labor is excessive in light of the fact that his conviction in this matter is his first and only felony conviction and, further, that he is an excellent candidate for a suspended sentence and probation. The trial court erred in denying defendant’s Motion to Reconsider Sentence which was filed on this basis.
The maximum penalty for attempted indecent behavior with a juvenile is three and one-half years imprisonment and a $2,500 fíne. Defendant was sentenced to three years imprisonment at hard labor; no fine was imposed.
| i7Lilley, a first felony offender, was a grid-cell 6-F offender for whom the sentencing guidelines recommend either imprisonment for 12-24 months or 80-120 intermediate sanction units. The trial court chose to depart upward from the guideline’s recommended sentence because of the youth of the victim and Lilley’s use of his status with the victim’s mother to facilitate the offense. The court also noted that Lilley molested “multiple victims in the incidents for which separate sentences have not been imposed,” referring to Starla Roberts, Lilley’s niece.
Defendant does not argue that the trial court should not have departed upward from the sentencing guidelines; he argues only that his sentence is excessive. A sentence violates LSA-Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 628 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate when the crime and punishment, considered in light of the harm done to society, shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Thompson, 25,583 (La.App. 2d Cir. 1/19/94), 631 So.2d 555. A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, we do not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (1988); State v. Madison, 535 So.2d 1024 (La.App. 2d Cir.1988); State v. Thompson, supra.
The defendant in this ease was convicted of attempted indecent behavior with a ten-year-old child. His record reveals that he had three prior D.W.I. convictions which may have been the catalyst for this offense. Defendant’s actions with this child were continued over a period of time. The child was very young and Lilley used his position of power over her. Further, multiple victims fell prey to his actions. In light | i8of these factors taken into consideration by the trial judge, we do not find that the sentence imposed is so excessive as to shock our sense of justice.
AFFIRMED.
BROWN, J., concurs with reasons.
WILLIAMS, J., dissents and assigns reasons.
APPLICATION FOR REHEARING
Before SEXTON, HIGHTOWER, BROWN and WILLIAMS, JJ., and CLARK, J. Pro Tern.
Rehearing denied.